# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**FIDIAS TORRES,**
        **Plaintiff,**

        **v.**                                    **Case No. 19-C-1491**

**CHILDREN'S HOSPITAL AND**
**HEALTH SYSTEM, INC.,**
        **Defendant.**

---

## <u>DECISION AND ORDER</u>

Plaintiff Fidias Torres alleges that her former employer, Children's Medical Group, Inc., violated the Americans with Disabilities Act ("ADA") and the Family and Medical Leave Act ("FMLA"). She contends that Children's discriminated against her on the basis of disability when it terminated her employment after failing to reasonably accommodate her mental-health conditions. She also contends that she was subjected to a hostile work environment. Finally, she contends that Children's retaliated against her for seeking a reasonable accommodation and/or for applying for FMLA leave. Before me now is Children's motion for summary judgment.

## I. BACKGROUND

### A.    General Background

Children's Medical Group, Inc., is an affiliate of Children's Hospital and Health System, Inc., a non-profit health-care system based in Wauwatosa, Wisconsin, that provides medical care to children and their families. In 2002, the plaintiff began working as a medical assistant at a clinic within the Children's system. From 2002 to 2017, she worked part-time at several different Children's locations. On September 10, 2017, she

began working at Franklin Pediatrics in Franklin, Wisconsin, a pediatrics clinic that is part of Children's Medical Group, Inc.

During her time at Franklin Pediatrics, the plaintiff held the position of medical assistant. She was classified as a part-time employee who was expected to work 24 hours per week. (Children's describes her position as "0.6 FTE," which means that she worked 60% of a full-time position.) Generally, the clinic scheduled her to work three eight-hour shifts per week, for a total of 12–13 shifts per month. The clinic was open Monday through Friday, from 8:30 a.m. to 5:00 p.m.

As a medical assistant, the plaintiff's primary responsibility was to "room" patients after they had checked in at the front desk. The process of rooming a patient involves escorting the patient to an exam room, taking the patient's vital signs, starting a progress note for the visit, asking the patient questions about medications and allergies, and eventually informing the physician that the patient is ready to be seen. Medical assistants also perform other clinical tasks, such as filling out electronic health records, administering certain medical tests, and collecting and labeling specimens. Franklin Pediatrics generally had one medical assistant and one physician work together for an entire shift. During the plaintiff's employment, Franklin Pediatrics employed four medical assistants to assist the five physicians who treated patients at the clinic. The plaintiff was supervised by Debra Danowski, the clinic's practice manager.

The plaintiff suffers from bipolar disorder, post-traumatic stress disorder, and anxiety and attention deficient disorder. These conditions cause her to become severely depressed, to feel isolated, and to have panic attacks. To treat her symptoms, the plaintiff takes several medications that make her extremely drowsy and sedated.

2

**B.    Background to Claim of Failure to Accommodate/Termination on the Basis of Disability**

On January 26, 2018, Danowski met with the plaintiff to discuss several issues with her job performance, including Danowski's observation that the plaintiff had frequently been arriving late for her scheduled shifts. When the plaintiff explained that the side effects of her medications caused her to oversleep, Danowski asked her whether it would help to move her scheduled start time from 8:30 a.m. to 9:00 a.m. The plaintiff said that it would. The plaintiff also expressed interest in starting even later, at 10:00 a.m. She believed that some of the physicians at the clinic did not start seeing patients until 10:00 a.m., and she asked to be the medical assistant assigned to the later-starting physician each day. However, the meeting ended with Danowski's agreeing to move the plaintiff's scheduled start time to 9:00 a.m.

Besides requiring her to take medications that caused her to oversleep, the plaintiff's mental conditions interfered with her ability to work in other respects. The plaintiff would experience "flare ups" of her conditions while at work that would cause severe anxiety or depression. Sometimes, when these flare-ups occurred, the plaintiff would have to abruptly leave work for the day. *See* Torres Dep. at 69–72. On other occasions, the plaintiff would experience depression or anxiety before work and be unable to report for her shift at all. *Id.* at 74–75.

On February 16, 2018, the plaintiff submitted a request to Children's third-party administrator to take intermittent leave, as needed, when she experienced flare-ups of her conditions. The plaintiff included a certification from her psychiatrist, Dr. Raymond Moy, with her request. Under Children's policy for administering family and medical leave and requests for accommodation of a disability, this was the first step in receiving such

3

leave or an accommodation. Under the policy, the third-party administrator could grant leave under the FMLA (or Wisconsin's version of the FMLA) without consulting Danowski or anyone else at the clinic. However, the third-party administrator could not grant a reasonable accommodation without receiving input from Danowski or other Children's personnel.

On March 2, 2018, a meeting was held to discuss the plaintiff's request for intermittent leave. The plaintiff and Danowski attended this meeting, as did Christine Prud'Homme (from Children's human-resources department) and a representative from Children's third-party administrator. After discussing the plaintiff's need for an accommodation beyond her 9:00 a.m. start time, the meeting participants agreed that the plaintiff would be permitted to arrive late for, or miss entirely, up to eight of her shifts each month without penalty when her health conditions prevented her from working. With this accommodation in place, the plaintiff could arrive late for work, leave early, or be absent for an entire shift, up to eight times per month, provided that Children's third-party administrator determined that the absence or late arrival was related to her medical condition. Under the terms of the accommodation, the plaintiff was expected to notify both Danowski and the third-party administrator each time she needed to use her leave. Further, the plaintiff was expected to inform Danowski at least one hour prior to the scheduled start of her shift that she would be using leave so that Danowski could attempt to reassign the plaintiff's responsibilities to other employees. Children's agreed to provide this accommodation to the plaintiff until August 8, 2018. It was hoped that, by then, the plaintiff would no longer need the accommodation because a revised treatment plan that Dr. Moy had started her on would be successful.

4

While Children's employed the plaintiff, it maintained an attendance policy under which an unexcused absence or late arrival qualified as an "occurrence." The policy recommended that the employee receive corrective action after accruing certain numbers of occurrences. For example, after the fourth occurrence, the employee should receive counseling about his or her attendance. The recommended corrective action increased in severity as the employee accrued more occurrences. The policy recommended that the employee be suspended or terminated after accruing 9 or more occurrences in a rolling 12-month period.

Once the plaintiff's leave program was approved, Danowski did not count the plaintiff's absences or late arrivals as occurrences under the attendance policy so long as the third-party administrator deemed them to be within the scope of the plaintiff's medical leave. However, Danowski continued to track the plaintiff's attendance, and she assessed occurrences for any absences or late arrivals that the third-party administrator did not approve.

Danowski found it very difficult to manage the plaintiff's leave. She found it hard to properly staff the clinic when the plaintiff could miss up to 75% of her 12–13 shifts per month. Further, the plaintiff consistently failed to provide Danowski one hour's notice of when she would be late or not coming in at all. According to Danowski's records, the plaintiff failed to provide one hour's notice for her absences and late arrivals on 40 occasions. Often, Danowski had to call the plaintiff after the scheduled start of her shift to determine whether the plaintiff intended to report for work at all. When the plaintiff did inform Danowski of her need to use leave, she often was unable to indicate when she would arrive. Danowski did not count the plaintiff's late notices as occurrences under the

5

attendance policy, but she did keep track of them so that she could factor them into any future evaluation of whether the leave program would be continued.

On July 6, 2018, Danowski and Prud'Homme met with the plaintiff to discuss her accommodations. Danowski informed her that her leave was proving very difficult to manage in large part because of how little notice she provided when she was not able to work, which made it difficult for Danowski to properly staff the clinic. Danowski and Prud'Homme informed the plaintiff that she could reapply for intermittent leave after it expired on August 8, 2018. But Danowski stated that, if the plaintiff reapplied, Danowski would have to evaluate the reasonableness of the request and that she would be unlikely to recommend continuing to grant the plaintiff up to eight excused absences per month. Danowski stated that she could, however, continue to provide the plaintiff with a 9:00 a.m. start time.

By the middle of August 2018, the plaintiff had accrued 10 occurrences under the attendance policy. None of these occurrences were assessed for absences that were excused under the plaintiff's leave program; instead, each occurrence represented an instance in which the plaintiff was late or absent and the third-party administrator did not certify that the attendance violation was related to her mental condition. Because the attendance policy recommended termination after 9 absences, Children's could have terminated the plaintiff at this time. However, on August 14, 2018, Danowski and Prud'Homme met with the plaintiff and delivered a performance warning in lieu of termination. But they made clear that if the plaintiff continued to accrue occurrences, the next step would be termination.

On September 19, 2018, Children's third-party administrator renewed the plaintiff's intermittent leave program in modified form. Under the renewed leave program, which ran from September 18, 2018 through December 31, 2018, the plaintiff was granted a total of 48 hours' leave that she could use as needed. The renewal of the plaintiff's leave came as a surprise to Danowski, who had not been consulted. On September 20, 2018, Danowski wrote an email to the third-party administrator in which she asked why the leave was approved without her input. The administrator told her that because the plaintiff had become eligible for leave under Wisconsin's version of the FMLA, the administrator could approve such leave without supervisor approval. The administrator stated that, after December 31, 2018, when the plaintiff exhausted her FMLA-style leave, Children's would reassess whether to grant the plaintiff additional leave as a reasonable accommodation. Danowski stated in response that, because of the difficulty in managing the plaintiff's leave, she intended to "lobby not to approve any additional leave" once the plaintiff exhausted her FMLA-style leave. *See* Danowski Dep. Ex. 24.

From September through December 2018, the plaintiff continued to be frequently late or absent. Many of these attendance infractions were excused under the leave program, but the plaintiff also accrued several absences that were not excused and thus qualified as occurrences under the attendance policy.

On January 10, 2019, the plaintiff contacted Children's third-party administrator to seek another extension of her leave program. At this time, the plaintiff was not eligible for leave under either the Wisconsin FMLA or the federal FMLA, and thus any additional leave would have to come in the form of a reasonable accommodation under the ADA. On January 11, 2019, the third-party administrator sent the plaintiff a letter stating that,

before it could evaluate her request for an accommodation, it would need to receive an updated certification from her medical provider. It advised her that it must receive the certification by January 26, 2019. The plaintiff then contacted Dr. Moy's office and was told that the doctor had received the certification request from the third-party administrator. But on January 19, 2019, the third-party administrator contacted the plaintiff and told her that it had yet to receive the certification from Dr. Moy. On January 23, 2019, the third-party administrator sent a letter to the plaintiff in which it extended the deadline to receive the certification until January 30. But the certification was never received, and on January 31, 2019, the third-party administrator sent a letter to the plaintiff informing her that her request for an accommodation was denied because the medical certification was not received. On February 4, 2020, the plaintiff contacted Dr. Moy's office and was told that the doctor did not fill out the paperwork because he was in the process of closing his practice.

Because the plaintiff's request to extend the intermittent leave program was denied for failure to submit the medical certification, the third-party administrator never contacted Danowski to obtain her input on extending the leave program. However, the record indicates that, had the administrator asked for Danowski's input, she would have opposed extending the program. As noted above, Danowski informed the administrator in September 2018 that she was likely to lobby against an extension of the program when the plaintiff's FMLA-style leave expired. Further, Danowski drafted an internal document known as an "SBAR" in which she detailed the difficulties she experienced in properly staffing the clinic while the plaintiff was using intermittent leave, and in which she

recommended not approving additional leave once the plaintiff's FMLA-style leave expired. *See* Danowski Dep. Ex. 22.

Beginning in January 2019, when the plaintiff's leave expired, all her late arrivals, early departures, and unexcused absences began to be counted as occurrences under the attendance policy. By February 14, 2019, the plaintiff had accrued eleven occurrences over a rolling 12-month period. At that point, Danowski met with Prud'Homme, and they decided to terminate the plaintiff's employment. They intended to inform the plaintiff of her termination in person when she arrived for her shift on February 19, 2019. However, the plaintiff did not report for her shift that day, thus incurring a twelfth occurrence. Because the plaintiff did not report to work, Danowski called the plaintiff to inform her that she had been terminated. Danowski gave the plaintiff the option of resigning in lieu of termination.

The next day, the plaintiff sent an email to Danowski stating that her absence the day before was caused by her bipolar disorder. The plaintiff asked Danowski to accommodate her by granting her time to see her new psychiatrist and allowing the psychiatrist to submit the paperwork necessary for the third-party administrator to process her leave request. The plaintiff said that her appointment with the psychiatrist was scheduled for March 4, 2018. After receiving this email, Danowski attempted to call the plaintiff, but the plaintiff did not answer. Instead, she texted Danowski and said that she was not available to talk over the phone.

In a letter dated February 21, 2019, Danowski informed the plaintiff that her employment was terminated because of her history of poor attendance. The letter stated that the plaintiff had accrued 12 occurrences over the past 12 months and identified each

9

occurrence. None of the cited occurrences involved a late arrival or absence that had been excused under the plaintiff's leave program.

## C.  Background to Claim of Hostile Work Environment

The plaintiff contends that her coworkers subjected her to a hostile work environment because of her disabilities while she worked at Franklin Pediatrics. On March 26, 2018, the plaintiff asked to meet with Danowski. During the meeting, the plaintiff told Danowski that she thought she was being "nitpicked" by her coworkers and that they were "bullying" her. Torres Dep. at 76–77. By "bullying," she meant that her coworkers would look at her social media account and then criticize her for making posts about her other part-time job, which was bartending. *Id.* at 77. The plaintiff told Danowski that she understood that some of her coworkers were not aware that she had a mental disorder, but that she felt like they were "shunning" her or "looking down on" her because she used so much leave. *Id.* at 78. Danowski told the plaintiff that her coworkers were frustrated with her because they felt like they must work harder and with less assistance due to her attendance. Danowski told the plaintiff to look at the shadow she cast, by which Danowski apparently meant that the plaintiff should pay attention to how she portrayed herself to her coworkers. *See* Danowski Decl. Ex. 2. Danowski told the plaintiff that she expected all employees to maintain professional relationships with each other but that being friends or even liking each other does not have to be part of that relationship. *Id.* Danowski then asked the plaintiff what she wanted to see changed or how she would like to see the work environment improve. *Id.* The plaintiff said that she was not sure but that she felt like she

was doing her job correctly. *Id.* The plaintiff asked Danowski what Danowski could do to help her, and Danowski said that she would think about it and identify her next steps. *Id.*

That afternoon, Danowski contacted Prud'Homme to tell her about her conversation with the plaintiff and to discuss how she might address the plaintiff's concerns. They decided that Danowski should speak with the plaintiff's coworkers about appropriate workplace behavior and work with them on how to manage their frustrations over the plaintiff's unreliable attendance. Danowski also intended to follow up with the plaintiff to clarify what she considered to be bullying and to solicit feedback from her about what might alleviate her concerns. Danowski Decl. ¶ 28 & Ex. 2. Thereafter, Danowski had one-on-one conversations with the plaintiff's coworkers "to discuss communicating with respect and maintaining professional relationships in the workplace as it relates to their interactions with [the plaintiff], regardless of her work attendance or any other issues." *Id.* ¶ 29.

On June 26, 2018, Danowski asked to meet with the plaintiff to discuss concerns about her job performance. The concerns included a family's complaint about her bedside manner, and physicians' concerns regarding delays in performing labs and rooming patients and their not being able to find the plaintiff during her shifts. During the meeting, the plaintiff reiterated her belief that she was being nitpicked and bullied by her coworkers. She also said that she thought that her position at Franklin Pediatrics was not a good fit and expressed interest in finding other employment options in the Children's system. Danowski advised the plaintiff to contact Prud'Homme, who managed human resources for Children's, to see whether other employment options were available.

11

Later that day, the plaintiff called Prud'Homme and expressed interest in applying for a different position. Prud'Homme advised the plaintiff that she could search for open positions on the Internet. The plaintiff also told Prud'Homme that she felt like she was being bullied by her coworkers at Franklin Pediatrics. *See* Torres Dep. at 91. When Prud'Homme asked the plaintiff what she meant by "bullying," the plaintiff was unable to elaborate. *Id.* But then when Prud'Homme asked for an example of bullying, the plaintiff said that her coworkers "make comments about mental disease," "shun" her, and refuse to help her do her job. *Id.* at 91–92. The plaintiff also told Prud'Homme that her coworkers "nitpick" the way she does her job and sometimes fail to say good morning to her or otherwise acknowledge her presence in the office. *Id.* at 92. Prud'Homme told the plaintiff that the behavior she was describing sounded more like incivility than bullying. *Id.* At this point, the plaintiff became irritated and felt like her concerns were being dismissed. *Id.* at 92–93.

During the following months, Danowski gave several presentations to staff members regarding bullying and proper treatment of coworkers. On July 19, 2018, Danowski conducted an all-staff meeting during which she provided training and guidance about bullying and incivility. She explained that Children's would not tolerate bullying in the workplace and would address any instances of bullying that came to management's attention to prevent it from recurring. On September 17, 2018, at another all-staff meeting, Danowski gave a presentation entitled "Bullying Prevention: Creating a Professional Working Environment." The presentation explained how to treat co-workers with professionalism, ways to create a positive work environment, and identified available resources for those who might be subject to bullying. Finally, at an all-staff meeting held

12

on November 15, 2018, Danowski spoke about integrity and reiterated Children's expectation that employees treat others with respect and compassion.

The plaintiff does not describe any incidents in which her coworkers made insulting comments to her about mental disease or any other disability or health condition. However, she points to two instances in which she thought her coworkers expressed disdain for people with mental conditions. First, the plaintiff describes a staff meeting during which an employee indicated that she would sometimes have panic attacks before coming to work. When Danowski asked whether anyone else had a similar experience, the plaintiff said that she did. She then said that she wakes up every morning wondering whether she should come to work or kill herself. Torres Dep. at 96. Someone in the meeting responded to her comment by saying, "Well, that's a little extreme." *Id.* The plaintiff considered this comment demeaning. Second, the plaintiff describes an instance in which coworkers were gossiping about one of the clinic's physicians. The physician had what the plaintiff described as a "meltdown" in the clinic one day earlier. Torres Dep. at 78–79. The plaintiff believed that this doctor had bipolar disorder, and she thought that her coworkers were insulting people with mental disease by describing the doctor as having "flipped out." *Id.*

### D.    Background to Retaliation Claim

The plaintiff also alleges that Children's retaliated against her for either seeking reasonable accommodations or applying for FMLA leave. Primarily, she claims that Children's retaliated against her by terminating her employment, but she also points to other alleged retaliatory acts. In this regard, she notes that Danowski often questioned the validity of the plaintiff's leave requests and that this worked to dissuade her from

13

enforcing her rights under the ADA and the FMLA. *Id.* Finally, the plaintiff accuses Danowski of falsifying attendance records to make it appear as though the plaintiff reported late to two shifts when she had actually arrived on time. *Id.*

* * *

Children's now moves for summary judgment on all the plaintiff's claims.

## II. DISCUSSION

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, I view the evidence in the light most favorable to the non-moving party and must grant the motion if no reasonable juror could find for that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986).

## A.    Failure to Provide a Reasonable Accommodation

Section 12112(a) of the ADA prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To prove a violation of § 12112(a), a plaintiff must show that: (1) she was disabled; (2) she was otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; (3) she suffered an adverse employment action; and (4) the adverse action was caused by her disability. *See, e.g., Kurtzhals v. County of Dunn*, 969 F.3d 725, 728 (7th Cir. 2020).

In the present case, the parties agree that the plaintiff's mental conditions are disabilities. The defendant moves for summary judgment on the ground that the plaintiff

14

was not qualified to perform the essential functions of her job with or without reasonable accommodation. The defendant contends that regular attendance and punctuality were essential functions of a medical assistant at Franklin Pediatrics, and that the plaintiff could not perform those functions with or without reasonable accommodation.

The plaintiff does not dispute that regular attendance and punctuality were essential functions of her position. And the Seventh Circuit has repeatedly recognized that regular attendance is an essential function of most jobs. *See, e.g., Whitaker v. Wis. Dep't of Health Servs.*, 849 F.3d 681, 684–85 (7th Cir. 2017); *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 813–14 (7th Cir. 2015); *Taylor-Novotny v. Health Alliance Med. Plans, Inc.*, 772 F.3d 478, 489–90 (7th Cir. 2014); *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1037 (7th Cir. 2013). There is no evidence in the record suggesting that the job of medical assistant is an unusual one in which regular attendance is not an essential function. Indeed, because a medical assistant meets with patients and assists physicians in a clinical setting, it would be impossible to perform the job without coming into work when scheduled. Thus, regular attendance and punctuality were essential functions of the plaintiff's position.

The plaintiff contends that she could have performed the essential functions of her job if Children's would have accommodated her in various respects. In her brief, she identifies several potential accommodations: (1) allowing her to arrive late, leave early, or miss shifts entirely when her disability or medications prevented her from working, (2) scheduling her shifts to begin at 10:00 a.m. or allowing her to work exclusively half-days in the afternoons, and (3) transferring her to a position in which she worked at the front desk. I address each potential accommodation in turn.

### 1. Permitting sporadic attendance

The plaintiff first contends that Children's should have accommodated her by continuing to excuse her absences and late arrivals when her mental conditions flared up or her medications caused her to oversleep. The plaintiff does not specify the number of absences or late arrivals she would have required each month, and she submits no evidence from a psychiatrist or other medical provider indicating how often she could have been expected to miss work. But based on her track record during her tenure at Franklin Pediatrics, the only reasonable conclusion is that the plaintiff would have required a substantial number of late arrivals and absences per month. During the six months in which she was allowed up to eight excused attendance infractions per month, the plaintiff used medical leave to arrive late or be absent for 25 of her 79 shifts. ECF No. 28-8 (report stating that between February 9, 2018 and August 8, 2018, plaintiff used medical leave to cover 25 of 79 shifts). Further, during the same period, the plaintiff was absent or late for reasons unrelated to her medical condition nine times. *See* ECF No. 28-7 (list of occurrences showing absences or late arrivals occurred on nine dates between March 9, 2018 and July 27, 2018). Thus, it appears that the plaintiff would have needed enough sporadic leave to cover at least one-third of her shifts each month. And because there is no indication that the plaintiff's mental condition is temporary, her need for this leave would likely have continued for as long as she held the job.

Another aspect of the plaintiff's proposed accommodation is that she be excused from providing notice to the clinic when she needs to use leave. Recall that when Children's initially allowed the plaintiff to miss shifts up to eight times per month, the company asked her to provide the clinic with one hour's notice whenever she intended to

use medical leave. The purpose of the notice requirement was to enable the clinic to reassign the work the plaintiff was expected to perform. But the plaintiff seldom provided one hour's notice, and often Danowski would have to call her after her shift began to determine whether she would be coming in. In her brief, the plaintiff now contends that Children's should have accommodated her further by excusing her from having to provide one hour's notice of her absences and late arrivals.[1] *See* Br. in Opp. at 18. The plaintiff notes that she was given a late start time precisely because her medications caused her to oversleep, and she contends that it was impossible for her to consistently provide one hour's notice of her absences. Essentially, then, the plaintiff contends that the ADA required Children's to have allowed her to arrive late or miss shifts several times per month without informing the clinic ahead of time so that it could attempt to reassign her duties to other employees.

Clearly, however, the ADA did not require this result. "A 'reasonable accommodation' is one that allows the disabled employee to 'perform the essential functions of the employment position.'" *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 481 (7th Cir. 2017) (quoting 42 U.S.C. § 12111(8)). In this case, as discussed, the essential functions of the plaintiff's position included regular attendance and punctuality. The frequent, sporadic, and unpredictable leave that the plaintiff sought as an accommodation would not have enabled her to perform these essential functions. Instead, such leave would have *excused* her from performing them. But the ADA does

---

[1] I note that Children's never penalized the plaintiff for failing to provide one hour's notice of her medical absences. Thus, Children's effectively granted her this accommodation as part of her medical leave program.

not require an employer to excuse a disabled person's inability to perform a job's essential tasks. *See id.*; *Byrne v. Avon Prods., Inc.*, 328 F.3d 379, 380–81 (7th Cir. 2003). Thus, the plaintiff's proposed sporadic leave program is not a reasonable accommodation.

Although Children's actually accommodated the plaintiff by tolerating her frequent and unpredictable absences for nearly a year, it does not follow that the ADA *required* Children's to make or continue to make this accommodation. The Seventh Circuit has recognized that if an employer "bends over backwards to accommodate a disabled worker—goes further than the law requires—by [making an accommodation], it must not be punished for its generosity by being deemed to have conceded the reasonableness of so far-reaching an accommodation." *Vande Zande v. Wisconsin Dep't of Admin.*, 44 F.3d 538, 545 (7th Cir.1995) In the present case, it is fair to say that Children's bent over backwards to accommodate the plaintiff when it allowed her to miss or be late for up to eight of her 12–13 shifts each month without penalty. That extraordinary accommodation was not required by the ADA, and therefore Children's having made the accommodation for a time did not bind it to continue making the accommodation for the duration of the plaintiff's employment.

### 2. Later start time or working half days in the afternoons

The plaintiff next contends that Franklin Pediatrics should have scheduled her shifts to start at 10:00 a.m. or allowed her to work exclusively half days in the afternoons. The plaintiff believes that this would have allowed her to be punctual despite the sedating effects of her medications. But even if these later start times would have prevented the plaintiff's tardiness, the plaintiff has not shown that they would have prevented her absenteeism. As noted in the background section, above, the plaintiff's conditions would

18

cause "flare ups" of severe anxiety or depression that prevented her from working and required her to either miss an entire shift or leave work early. A later start time would not have accommodated the plaintiff's need to suddenly miss work when she experienced a flare up. Thus, a later start time, by itself, would not have been an effective accommodation.

In any event, even if a 10:00 a.m. start time or an afternoons-only schedule would have been effective in addressing all facets of the plaintiff's disability, the plaintiff has not shown that a reasonable jury could find that these scheduling changes amounted to reasonable accommodations. The defendant's evidence establishes that medical assistants are generally paired with a physician for an entire shift and therefore must work the same hours as the physician. At the time of the plaintiff's termination, all physicians at the Franklin Clinic started seeing patients before 9:00 a.m., which meant that medical assistants needed to be on hand to room patients before 9:00 a.m. *See* Danowski Decl. ¶¶ 44–45. In March 2018, when the plaintiff was first granted a 9:00 a.m. start time and expressed interest in starting at 10:00 a.m., some physicians worked late one evening each week and offset their late hours by starting the day at 10:00 a.m. *Id.* ¶ 44. However, by the spring of 2018, no physician at the clinic started seeing patients at 10:00 a.m. or later. *Id.* Thus, for the 10-month period preceding the plaintiff's termination, the clinic did not have shifts for medical assistants that started at 10:00 a.m. Moreover, the clinic did not have regular half-day shifts for medical assistants. *See* Danowski Dep. at 28, 92–93,

19

163.[2] For these reasons, one essential function of the plaintiff's position was to work full days on the three days she was scheduled to work each week.

For the clinic to have provided the plaintiff with a 10:00 a.m. or noon start time, it would have had to have reassigned all the essential functions of her job to other employees until she arrived, either by hiring a medical assistant who could work the plaintiff's morning hours or reassigning the plaintiff's morning work to the medical assistants already assigned to other physicians. But reassigning the essential functions of a job to other employees is not a reasonable accommodation. *Tonyan v. Dunham's Athleisure Corp.*, 966 F.3d 681, 689 (7th Cir. 2020); *Stern v. St. Anthony's Health Ctr.*, 788 F.3d 276, 289–90 (7th Cir. 2015); *Basith v. Cook County*, 241 F.3d 919, 929–30 (7th Cir. 2001); *Ozlowski v. Henderson*, 237 F.3d 837, 841 (7th Cir. 2001). Nor is an employer required to create a position to accommodate a disabled worker, such as the afternoons-only position the plaintiff proposes. *Severson*, 872 F.3d at 482. And here, the clinic would have had to have created two new positions: a half-day, afternoons-only position for the plaintiff, and a half-day, mornings-only position for another medical assistant. *See* Danowski Dep. at 212.

---

[2] At her deposition, Danowski said that she would occasionally schedule a medical assistant for a half day to cover for someone else who was leaving for a half day. Danowski Dep. at 28, 91. Usually, the employee assigned to cover the half day would be a "casual" employee—an employee who was generally not guaranteed a set schedule or number of hours each week. *Id.* The plaintiff was not a casual employee (as noted, she was 0.6 FTE), and she does not contend that she should have been transferred to a vacant casual position as a reasonable accommodation. No evidence in the record suggests that Franklin Pediatrics scheduled non-casual medical assistants for regular half-day shifts.

I am aware that, in some cases, job restructuring and modified work schedules may be reasonable accommodations. *See* 42 U.S.C. § 12111(9)(B). But whether they are depends upon the nature of the job and the employer's business practices. If the plaintiff worked at a large medical facility that employed lots of medical assistants, many of whom worked part-time or limited hours, then the ADA might have required the facility to restructure the plaintiff's schedule so that she did not have to arrive at work until 10:00 a.m. or later. Indeed, if many medical assistants at the clinic regularly worked varying hours, then working specific hours would not have been an essential function of the position. *Cf. Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 199–200 (7th Cir. 2011) (finding that ability to perform task was not essential function when evidence showed that the normal practice among workers was to reassign tasks among themselves according to their abilities). But Franklin Pediatrics was a small clinic that employed only four medical assistants to assist the clinic's five physicians, and it generally paired one medical assistant with one physician each day. *See* Danowski Decl. ¶ 12. It did not employ a medical assistant who could have worked from 8:30 a.m. to 10:00 a.m. three times per week or only in the mornings five days per week. Further, the clinic believed that the office operated more efficiently when one medical assistant was paired with the same physician for an entire eight-hour shift than when one physician's schedule was split up between multiple medical assistants. Danowski Dep. at 93–94. Thus, the clinic could not have modified the plaintiff's schedule as she proposed without seriously altering the essential functions of her position and the clinic's business practices.[3]

---

[3] I note that, in referencing the burden the plaintiff's proposed modified schedule would have imposed on Franklin Pediatrics, I do not mean to imply that I am deciding this case

The plaintiff points out that Franklin Pediatrics once allowed a non-disabled employee, Christine Fischer, to work only in the afternoons while she finished her education to become a registered nurse. However, at the time Fischer was allowed to work afternoons, she held the position of licensed practical nurse; she was not a medical assistant responsible for rooming patients. *See* Danowski Dep. at 106–08. No evidence in the record suggests that the clinic assigned the same duties to licensed practical nurses as it did to medical assistants. Further, Fischer's afternoons-only schedule was temporary: the clinic allowed her to work those hours for one semester while she finished her RN program. *Id.* at 212. The plaintiff's accommodation, on the other hand, would have been indefinite. For these reasons, the clinic's temporary accommodation of Fischer's school schedule does not create a triable issue of fact on whether regular attendance from 8:30 a.m. to 5:00 p.m. was an essential function of the plaintiff's job.

### 3. Transfer to front desk

Finally, the plaintiff contends that Franklin Pediatrics should have accommodated her by transferring her to a position in which she worked as a receptionist at the front desk. In January 2019, about a month before she was terminated, the plaintiff told Danowski she might be interested in working the front desk. *See* Danowski Dep. Ex. 27.

---

under the "undue hardship" prong of the reasonable-accommodation inquiry. *See* 42 U.S.C. § 12112(b)(5)(A). "The question of undue hardship is a second-tier inquiry under the statute; that is, the hardship exception does not come into play absent a determination that a reasonable accommodation was available." *Severson*, 872 F.3d at 480 n.1. In the present case, because the record shows that the essential functions of the plaintiff's position required her to punctually report for three eight-hour shifts per week, the modified work schedule she proposes would not have been a reasonable accommodation. Thus, the defendant does not have to show that the modified work schedule would have presented an undue hardship.

The plaintiff argues that the clinic should have explored the option of transferring her to that position before they terminated her.

Although reassignment to a different position can be a reasonable accommodation, the duty to reassign extends only to vacant positions—an employer is not required to "bump" other employees to create a vacancy. *See, e.g., Dunderdale v. United Airlines, Inc.*, 807 F.3d 849, 856 (7th Cir. 2015). It is the plaintiff's burden to prove that a vacant position existed at the time of her termination. *Id.* Here, the plaintiff's evidence would not allow a reasonable jury to find that a front-desk position was vacant in early 2019. The only evidence on this point from Danowski, who testified that, at the time the plaintiff proposed working at the front desk, the clinic did not have a vacant front-desk position. *See* Danowski Dep. at 192, 201. Thus, because the plaintiff has not shown that a vacancy existed, she cannot succeed on her claim that the defendant should have transferred her to the front desk as a reasonable accommodation.

But even if the plaintiff could prove that there was a vacancy at the front desk, her argument would fail because she has not shown that this was a job she was qualified to perform. Like the medical-assistant position, the front-desk position required regular attendance and punctuality. No evidence in the record suggests that the clinic could have tolerated a front-desk employee who was frequently late and who needed to miss entire shifts on little or no notice. To the contrary, Danowski testified that the clinic does not have back-up employees who can cover the front desk when the scheduled receptionist calls in. *See* Danowski Dep. at 39. Further, no evidence in the record suggests that the clinic employs receptionists who regularly start at 10:00 a.m. or work exclusively in the afternoons. Thus, no evidence suggests that the front-desk position would have

23

accommodated the plaintiff's need for a later start time and need to be frequently absent without notice.

### 4. Effect of failure to submit medical certification

Before leaving the plaintiff's reasonable-accommodation claim, I note that she contends that Children's should have "accommodated" her by granting her an extension of the deadline to have her doctor submit the medical certification to Children's third-party administrator. *See* Br. in Opp. at 12, 19. But the plaintiff's disabilities were not the cause of her doctor's failure to submit the certification on time, and anyway submitting the form was not one of the essential functions of the plaintiff's job. Thus, there is no sense in which an extension of time to submit the certification could be deemed a reasonable accommodation of her disabilities.

Perhaps the plaintiff meant to argue that Children's refusal to further extend the deadline amounted to a breakdown of the "interactive process" that governs an employee's request for a reasonable accommodation. *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1038 (7th Cir. 2013) (noting that employee's request for an accommodation "requires the employer to engage in a flexible, interactive process to identify a reasonable accommodation"). However, even if the plaintiff's argument were construed as one involving the interactive process, it would still fail. "[T]he failure to engage in the interactive process required by the ADA is not an independent basis for liability under the statute, and that failure is actionable only if it prevents identification of an appropriate accommodation for a qualified individual." *Id.* at 1039. For the reasons discussed above, the ADA did not require the defendant to grant the plaintiff sporadic leave, grant her a 10:00 a.m. start time, allow her to work afternoons exclusively, or transfer her to the front

24

desk. Further, the plaintiff identifies no other ADA-required accommodation that might have been identified had the third-party administrator not rejected her application for failure to submit the medical certification. Thus, even if the rejection amounted to a breakdown of the interactive process, it would not result in the defendant's liability.

**B.     Hostile Work Environment**

The plaintiff next contends that she was subject to a hostile work environment on the basis of disability while she was employed at Franklin Pediatrics. To survive summary judgment on this claim, the plaintiff must present evidence that: (1) she was subject to unwelcome harassment; (2) the harassment was based on her disability; (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability. *Ford v. Marion County Sheriff's Office*, 942 F.3d 839, 856 (7th Cir. 2019).

I consider the first three elements together because they are closely related. The plaintiff does not allege that anyone at Franklin Pediatrics made fun of her because of her disabilities or belittled her for having a mental condition. Nor does she allege that anyone made ableist comments.[4] Instead, she contends that her coworkers "nitpicked" her work performance and generally were unfriendly to her.[5] But criticizing a person's work

---

[4] During her deposition, the plaintiff said that her coworkers made "comments about mental disease." *See* Torres Dep. at 91. However, she did not identify those comments, and she does not identify them in her response to the defendant's motion for summary judgment. Thus, the record contains nothing that would enable a reasonable jury to find that the comments about mental disease were negative or that, if they were, they were so severe and pervasive as to create a hostile work environment.

[5] She also claims that her coworkers "bullied" her, but this seems to have been the term she used to describe their nitpicking and unfriendliness.

performance is not a form of unwelcome harassment. *See Abrego v. Wilkie*, 907 F.3d 1004, 1015–16 (7th Cir. 2018) (finding that a supervisor's being "unfairly critical" did not constitute severe and pervasive harassment). Further, a coworker's exhibiting "personal animosity" is not a form of unwelcome harassment. *Tyburski v. City of Chicago*, 964 F.3d 590, 602 (7th Cir. 2020). Thus, the plaintiff's coworkers did not subject her to discriminatory harassment when they refused to say good morning to her, made negative comments about her social-media posts, or engaged in other conduct that the plaintiff regarded as unfriendly.

The plaintiff points to an instance in which one of her coworkers told her she was being "a little extreme" when she said at a meeting that she wakes up every morning wondering whether she should come to work or kill herself. Torres Dep. at 96. But this comment does not exhibit hostility towards individuals with disabilities. At worst, the comment reflects a lack of understanding of the symptoms of anxiety and depression.

The plaintiff also points out that her coworkers described Dr. Baker, a physician at the clinic who suffered from bipolar disorder, as having "flipped out" during an incident that occurred in the clinic. Torres Dep. at 78–79. But, as far as the record reveals, the plaintiff's coworkers were simply gossiping about the incident, not insulting a person for having a mental disability. Indeed, the record does not even indicate that the incident involving Dr. Baker was caused by a disability or that, if it was, the coworkers knew that it was. Moreover, the comments the coworkers made cannot fairly be characterized as hostile. According to the plaintiff (who did not witness the incident), the coworkers described Dr. Baker as having "flipped out" and noted that the incident was "embarrassing." *Id.* at 79. These are not the kinds of insulting comments that create a

26

hostile work environment. I note that the plaintiff herself used the work "meltdown" when referring to Dr. Baker's conduct, *id.*, and that this belies the possibility that terms such as "meltdown" and "flipping out" express hostility towards people with mental disorders. In any event, even if these comments could be construed as hostile, they would at most amount to stray remarks that "are more reflective of run of the mill uncouth behavior than an atmosphere permeated with discriminatory ridicule and insult." *Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 678 (7th Cir. 2005).

The plaintiff also contends that "[t]here was a general disdain" among the staff for her because she was allowed to have a later start time, take longer breaks, and use intermittent leave. Br. in Opp. at 1. However, a "general disdain" does not necessarily create a hostile work environment. As discussed above, to show that the work environment was hostile, the plaintiff must point to instances in which she was subject to unwelcome harassment, which she has been unable to do. Moreover, the record does not suggest that any disdain her coworkers expressed was motivated by hostility towards individuals with disabilities. The way Children's accommodated the plaintiff was by requiring her coworkers to cover for her when she was tardy or unexpectedly absent, and it appears that her coworkers started to feel resentment over having to do parts of the plaintiff's job for her. *See* Danowski Decl. Ex. 2 (Danowski note reflecting that the plaintiff's coworkers are "frustrated with her because they feel like they have to work harder and with less assistance due to her attendance"). As far as the record reveals, the plaintiff's coworkers would have resented her even if her poor attendance was unrelated to a disability. And in fact, the plaintiff had many attendance infractions that

were unrelated to her disabilities. Thus, her coworkers' disdain for her poor attendance cannot be viewed as a form of disability discrimination.

As part of her hostile-work-environment claim, the plaintiff lists several ways in which she feels she was subjected to disparate treatment in the workplace. *See* Br. in Opp. at 6. She claims that she was "yelled at" for using her cell phone while another employee was using a speakerphone that disrupted the clinic, that she was not allowed to bring her daughter into the nurses station when other employees were allowed to bring their children there, and that she was never provided with her own locker or a desk. *See* Pl. PFOF ¶ 56. However, these instances of disparate treatment do not support a hostile-work-environment claim. They are not instances of unwelcome harassment, and in any event no evidence suggests that this treatment was motivated by animus towards individuals with disabilities.

For these reasons, a reasonable jury could not find that the plaintiff was subject to a hostile work environment. But even if it could, summary judgment would be required on the element of employer liability. To show a basis for employer liability, the plaintiff must show either that (1) she was harassed by a supervisor or (2) she was harassed by non-supervisor coworkers and the employer was negligent in discovering or remedying the harassment. *See Ford*, 942 F.3d at 856. In the present case, the plaintiff concedes that she was never harassed by a supervisor.[6] Thus, to establish employer liability, she must

---

[6] In her brief, the plaintiff "agrees that Danowski did not harass her on the basis of her disability." Br. in Opp. at 15. She does not contend that anyone other than Danowski was one of her supervisors. However, I will assume that Prud'Homme, the human-resources manager, was also a supervisor. The plaintiff does not claim that Prud'Homme harassed her, either.

show that Children's was negligent in discovering or remedying harassment by coworkers.

On several occasions, the plaintiff told Danowski that her coworkers were nitpicking and bullying her. During a phone conversation, she made a similar complaint to Prud'Homme. But the plaintiff does not claim that she ever told Danowski or Prud'Homme that her coworkers were harassing her by making negative comments about her disabilities or about people with disabilities in general. And, as discussed above, there is no evidence in the record suggesting that the plaintiff's coworkers made any such comments in the first place. Danowski took steps to address the plaintiff's complaints of nitpicking and bullying, including by speaking one-on-one with each of the plaintiff's coworkers and by giving presentations during staff meetings about bullying prevention. The plaintiff does not identify any other step that a reasonable employer would have taken to address her concerns. Thus, even if the nitpicking and bullying the plaintiff experienced amounted to harassment on the basis of disability, the plaintiff has not shown that Children's was negligent in failing to discover or remedy the harassment.

Accordingly, Children's is entitled to summary judgment on the plaintiff's hostile-work-environment claim.

## C. Retaliation

Finally, the plaintiff claims that Children's is liable under both the ADA and the FMLA for retaliating against her for having requested sporadic leave and other accommodations of her disability. However, the plaintiff concedes that she was never eligible for leave under the FMLA, *see* Br. in Opp. at 23, and thus it is not clear how Children's could have retaliated against her for engaging in protected activity under the

29

FMLA. In any event, the elements of a retaliation claim under the FMLA are the same as the elements of a retaliation claim under the ADA, *see Freelain v. Village of Oak Park*, 888 F.3d 895, 900–011 (7th Cir. 2018), and the facts underlying the plaintiff's retaliation claims are identical: the plaintiff alleges that Children's retaliated against her for requesting an accommodation that included sporadic leave. Thus, for simplicity, I will address this claim under the ADA only and assume that the same result would obtain under the FMLA.

Retaliation claims require three elements: (1) the employee engaged in statutorily protected activity; (2) the employer took adverse action against the employee; and (3) the protected activity caused the adverse action. *Freelain*, 888 F.3d at 901. Here, the protected activity was the plaintiff's using sporadic leave and then requesting, in January 2019, that Children's continue to provide her with such leave to accommodate her need to arrive late and miss shifts entirely due to the effects of her medications and her mental conditions. Primarily, the plaintiff contends that the adverse action was Children's terminating her employment in February 2019. However, the plaintiff also contends that Danowski personally subjected her to other adverse actions by (1) questioning the validity of her leave or telling her that certain absences would not be excused and (2) falsifying her attendance records. *See* Br. in Opp. at 23.

Starting with the termination, I conclude that a reasonable jury could not find that it was retaliation for having requested or used an accommodation. As discussed above, Children's generously accommodated the plaintiff for over six months by allowing her to arrive late or miss shifts entirely up to eight times per month without consequence. The accommodation ended when Children's third-party administrator denied the plaintiff's

30

third application for sporadic leave on the ground that the plaintiff's psychiatrist had failed to provide a medical certification. Following the denial, the plaintiff accrued multiple attendance occurrences that were no longer excused. At that point, Danowski and Prud'Homme decided to terminate the plaintiff's employment based on the number of attendance occurrences she had accrued over the prior 12 months. (It bears repeating that Children's did not count any absence or late arrival that was excused under the plaintiff's prior medical-leave programs as occurrences.) This sequence of events shows that the plaintiff was terminated based on her attendance record, not because she had requested an accommodation or used leave. Indeed, the plaintiff points to no evidence at all suggesting that Children's terminated her because she had requested an accommodation or used leave. Although the plaintiff correctly notes that Danowski was opposed to granting her additional leave, this is not evidence that Danowski wanted to retaliate against her for having used leave in the past. And Danowski's opposition to granting further leave was legitimate, as it was based on her belief that she could not properly staff the clinic while the company tolerated the plaintiff's unreliable attendance. Thus, no reasonable jury could find that Children's terminated the plaintiff's employment in retaliation for her having used leave in the past or having used or requested an accommodation under the ADA.

As for Danowski's questioning the validity of the plaintiff's leave and telling her that certain absences would not be covered, the plaintiff has not established that a jury could reasonably find that these were "adverse actions." To count an employer's action as adverse, a plaintiff must show that it would have dissuaded a reasonable worker from engaging in protected activity. *Freelain*, 888 F.3d at 901–02. This test uses an objective

31

standard, based on how a reasonable employee might react, not the plaintiff's subjective feelings. *Id.* Here, the plaintiff asserts that Danowski's raising questions about the validity of her leave dissuaded her from enforcing her rights. But the questioning to which the plaintiff refers was directed at Prud'Homme and the third-party administrator, not at the plaintiff. *See* Pl. PFOF ¶ 73 (citing Danowski's emails to administrators). So far as the record reveals, the plaintiff did not learn that Danowski was asking questions about her leave until she obtained Danowski's emails during discovery in this lawsuit. Obviously, if the plaintiff did not know that Danowski was asking questions about her leave behind the scenes, such conduct could not have dissuaded her (or a reasonable employee) from enforcing her rights while she was employed at the clinic. In any event, I not see how Danowski's asking legitimate questions about the scope of the plaintiff's leave could be reasonably viewed as retaliatory.

The plaintiff also contends that Danowski inflicted an adverse action when she told her that "various reasons for leave would not be covered by the accommodation." Br. in Opp. at 23. The plaintiff does not cite any facts to support this claim in her brief, *see id.*, but I assume she is referring to an instance in which Danowski told her that she thought a dental visit would not fall within the scope of the accommodation because it did not relate to her mental conditions. *See* Pl. PFOF ¶ 72. Clearly, this comment would not dissuade a reasonable person from exercising his or her rights under the ADA. Danowski was only expressing confusion over how the dental visit was related to the plaintiff's mental conditions. Apparently, the dental visit triggered the plaintiff's anxiety, but Danowski could not have been expected to know that. Thus, Danowski's suggesting that

the dental visit would not be within the scope of the leave program cannot reasonably be viewed as a retaliatory act.

The remaining alleged adverse action is Danowski's allegedly falsifying the plaintiff's attendance records. The plaintiff states in her declaration that, on two occasions, Danowski recorded her as having arrived at 9:05 a.m. when, in fact, she had arrived by 9:04 a.m. Torres Decl. ¶ 5. Children's defines tardiness as arriving at least five minutes late, and thus if the plaintiff had actually arrived by 9:04 a.m., she would not have accrued occurrences under the attendance policy. The plaintiff believes that Danowski intentionally marked her start time as 9:05 a.m. to cause her to accrue occurrences. But the plaintiff has produced no evidence that supports her belief. The record indicates that the plaintiff believes she arrived to work within the four-minute grace period and that Danowski marked her as having arrived at 9:05 a.m. But there is no evidence that Danowski *knew* the plaintiff arrived by 9:04 a.m. and intentionally falsified her attendance records to inflate the number of occurrences.

Accordingly, Children's is entitled to summary judgment on the plaintiff's retaliation claims.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the defendant's motion for summary judgment is **GRANTED**. The Clerk of Court shall enter final judgment.

Dated at Milwaukee, Wisconsin, this 30th day of November, 2020.

s/Lynn Adelman
LYNN ADELMAN
United States District Judge

33